D. E. HOLMAN, Administrator of Estate of ELMER E. REAVES, v. ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, Appellant.

Division Two, January 6, 1926.

1. **NEGLIGENCE: Demurrer to Evidence: Substantial: Reasonable Inference.** In order to uphold defendant's assignment that its demurrer to the evidence offered at the conclusion of the case should have been sustained, the appellate court is compelled to hold that plaintiff produced no substantial evidence tending to sustain the allegations of negligence contained in the petition, and must proceed on the theory that plaintiff is entitled to every reasonable inference which a fair-minded jury of average intelligence might properly draw from the proven facts in the case.

2. ———: **Imputed Knowledge: Repairing Cars.** That which appellant's foreman could have learned by the exercise of ordinary care will be imputed to him as a known fact. So that, in the absence of any

Holman v. Railway Company.

evidence on the subject, the jury were justified in finding that defendant's foreman, when he placed a notation card on a defective car for the guidance of the men who were repairing it, had notice that the bent and unsafe brake hanger in plain view at the end of the car needed repairing; and having asked the men if they could "get the car done" before they quit for the day, that he knew the brake hanger would be repaired before they quit work; and therefore knowledge was imputable to defendant that said men were still at work upon said brake hanger when an engine was suddenly run in upon the repair track a single minute after the whistle blew and the track was unlocked by the foreman.

3. ———: ———: Failure to Testify: Right of Jury. The jury has the legal right to take into consideration the fact that the foreman, whose negligence the petition charges caused the death of the car repairer, did not testify, and left them to infer from other facts in evidence that he had knowledge of the dangerous situation which his orders had produced.

4. ———: Demurrer to Evidence: Presumption Against Neglect of Duty: Car Repairer: Working Overtime: Locked Switch: Blue Flag: Imputed Knowledge. Three repair tracks were filled with defective cars, two or three feet apart, and about thirty men were at work repairing them. During work hours the tracks were locked at the east end and a blue flag maintained, so that an engine could not enter upon them, but at five o'clock the whistle blew, the tracks were unlocked, the blue flag removed, and the engine entered to remove the cars which had been repaired. When a car was placed on a repair track it was inspected by the foreman, and all defects noted on a card, which was placed upon the car, so that the repairers by examining the card could readily ascertain the repairs needed and proceed to make them. In case the foreman wanted a car being repaired finished before quitting time, it was the practice of the repairers to finish it by working a few minutes overtime, and during such overtime the blue flag was left in position and the switch remained locked, and the foreman had control of the switch locks and the flag, and the repairers relied upon him to protect them. Deceased and his partner in the course of their work soon after four o'clock reached a car which stood about one hundred feet west of the switch, two other cars being between it and the switch. The notation card was not produced in evidence, and it was not shown what repairs were noted on the card. About ten minutes to five o'clock as they were repairing a coupler on the west end of the car, the foreman came to them and asked if they would "get it done." The repairs were difficult and they were having trouble with the sleeve bolt, but deceased's partner told the foreman they would finish the car before they quit. The foreman

thereupon took the card from the car, and without either man sign-ing it walked away west. Just as they finished the coupler the five-o'clock whistle blew. Deceased came out from under the car, picked up a sledge hammer, walked to the east, and dropped the hammer in order to straighten a brake hanger—an iron rod used to support the brake beam. To straighten the bent rod was a work of only two licks with the sledge hammer, and thirty seconds. While deceased had the brake hanger in position, and was between the couplers of the two cars, his partner struck it one lick with the sledge hammer, and just as he raised the hammer to strike another lick the cars came suddenly together, caught and killed him. The blue flag had been removed and the switch unlocked one minute before five o'clock, and immediately after the switch blew the switch engine came in, striking and jamming the cars together. The foreman did not testify, and the case was submitted to the jury upon the testimony of plaintiff's witnesses and their cross-examina-tion by defendant's counsel. *Held, first,* that, in the absence of evi-dence as to what notation was on the card, it cannot be presumed that the foreman neglected his duty to inspect the east end of the car where the defective brake hanger was in plain view or that he failed to note on the card its bent and unsafe condition; *second,* in view of the fact that the foreman did not testify, the jury were justified in finding that the foreman knew the bent and unsafe con-dition of the brake hanger when he requested the men to finish the car before quitting; and, *third,* there was substantial evidence from which the jury could reasonably infer that the death of deceased was due to the negligence of the foreman, in unlocking the switch and removing the blue flag and permitting the engine to enter upon the repair track when he knew that the men had not finished repairing the car and were endeavoring to do so at his request and in accordance with the practice of working overtime under such cir-cumstances.

5. ————: Immaterial Evidence: General Situation. Even though it be true that certain testimony was immaterial and did not tend to prove or disprove any issue in the case the overruling of an objec-tion thereto will not be reversible error where appellant was not in-jured by its admission. Besides, though the testimony does not bear precisely on the precise issue, it is proper for either side to show the general situation out of which the accident grew and the attendant and correlated circumstances.

6. ————: Instruction. An instruction that properly declares the law applicable to the facts of the case, is not erroneous.

7. ————: ————: Measure of Damages: Compensation: Elements. In an action for the negligent death of a railroad employee engaged in interstate commerce, brought by his administrator on behalf of

Holman v. Railway Company.

his widow and children, in which there is no claim of contributory negligence, an instruction telling the jury that "if you find for plaintiff, then you should, in assessing the damages, take into consideration the age and habits of life of the deceased, as well as the age of the widow, and the ages of the minor children of deceased; and you should allow the widow such sum as will be a fair and reasonable compensation to her for the pecuniary loss, if any, sustained by her on account of the death of her husband; and you should also allow the minor children of deceased such sum as will be a fair and reasonable compensation to them for the pecuniary loss, if any, sustained by each of them on account of the death of their said father; and in determining the amount, if any, you allow said minor children, you should take into consideration their respective ages, as well as their condition in life, and the amount, if any, you may find from the evidence the deceased would probably have contributed to each of them during their respective minorities, had he lived, but in all, your verdict should not exceed the sum of fifty thousand dollars, the amount sued for," is approved on the authority of recent decisions of this court and of the Supreme Court of the United States.

8. ———: **Assumption of Risk: Car Repairer.** Where the foreman, about ten minutes before five o'clock, the usual quitting time, asked the deceased and his partner, who were repairing a defective car, if they would get it done, and was told by them that they would finish the car before they quit, and a minute before five o'clock he unlocked the switch and removed the blue flag, over which he had complete control, and permitted the engine to enter the repair track and drive another car onto the one which they were repairing, just as they were in the final act of repairing it, and thereby deceased was killed, deceased did not assume the risk, but his death was due to the positive negligence of the foreman.

9. ———: **Excessive Verdict: Passion and Prejudice.** Notwithstanding the verdict for $40,000 as returned by the jury was excessive, and upon its return respondent voluntarily remitted $25,000 of the amount, a judgment for the balance, being $5,000 for the widow of the deceased car repairer, aged twenty-nine years, $2500 for a son aged eight years, $3500 for a daughter aged four years and $4,000 for another child aged two years, or $15,000 in all, is not excessive; and the case being well tried, the plaintiff having presented a meritorious case, and there being nothing in the record to indicate that the jury were prejudiced against defendant or acted through sympathy for the widow and minor children, the assignment that

the excessive verdict as returned by the jury establishes passion and prejudice upon their part will not be allowed.

Appeal and Error, 4 C. J., Section 2952, p. 969, n. 56. Death, 17 C. J., Section 183, p. 1314, n. 75; Section 235, p. 1350, n. 7. Master and Servant, 39 C. J., Section 575, p. 458, n. 7; Section 649, p. 546, n. 72, 77; Section 1243, p. 1032, n. 70; Section 1331, p. 1139, n. 83; Section 1340, p. 1153, n. 95; Section 1352, p. 1168, n. 78; Section 1414, p. 1238, n. 96. Negligence, 29 Cyc., p. 627, n. 37. Trial, 38 Cyc., p. 1543, n. 69; p. 1547, n. 22 New.

Appeal from Polk Circuit Court.—*Hon. C. H. Skinker,* Judge.

AFFIRMED.

*E. T. Miller, Herman Pufahl* and *Mann & Mann* for appellant.

(1) The court erred in refusing to give defendant's instruction in the nature of a demurrer to the evidence. Plaintiff's right to recover in this case is based entirely upon the theory that defendant's foreman, Barker, had knowledge, actual or constructive, that deceased was working on the car after five o'clock, the regular quitting time. Plaintiff is not entitled to recover, absent notice, merely because the accident occurred so shortly after five o'clock. The testimony clearly shows that during all the time that deceased had worked in this yard it had been the uniform custom to remove the flag and unlock the switch at five o'clock. It had also been the custom for engines to move cars in upon this track immediately following the unlocking of the switch and removal of the flag. Lake knew of this custom. Deceased is charged with knowledge of it. The only exception to that rule of unlocking the switch and removing the flag at five o'clock was when some of the men worked overtime, either by request of the foreman or after notifying the foreman of their intention so to do. So the ruling on this demurrer and the right of plaintiff to recover depends entirely upon whether there is testimony from which the jury could find that the foreman, Barker, knew that deceased would remain working on the car after the whistle blew. The testimony clearly shows that

what Lake told the foreman was that they would finish
the car. Nothing was said about their working over-
time and the only reasonable inference from his state-
ment to the foreman was that they would finish it by
quitting time, five o'clock. The fact that the foreman
took up the card and went away, not expecting to return,
conclusively shows that he did not know that repairs
were necessary on the brake hanger at the opposite end
of the car and that he had no reason to believe that aft-
er finishing the work on the sleeve bolt these men would
remain to do any other work about the car. (a) If this
record discloses knowledge to defendant that it might
take deceased until a few minutes after five to complete
the work on the sleeve bolt at the west end of the car,
it does not follow that the defendant was guilty of
negligence in permitting the car to be moved, under
the facts in this case, for the reason that deceased was
not working on the west end of the car and was there-
fore not at the place where, by reason of his presence,
had he been at the west end of the car, it would
have been negligence to have permitted the car to be
moved. (b) A duty to protect one in a particular
position or place does not extend to a person in an en-
tirely different position or place. Degonia v. Railroad,
224 Mo. 594; Mansfield v. Wagner Electric Manufactur-
ing Co., 242 S. W. 400; Butz v. Cavanaugh, 137 Mo. 503;
Chicago Railroad v. Minneapolis Railroad, 176 Fed. 241.
(c) Deceased assumed the risk of injury. The doctrine
of assumption of risk as recognized and applied in the
Federal courts, and by the courts of this State in cases
falling under the Federal Employers' Liability Act,
governs this case. The deceased knew of the uniform
custom to remove the flag and special switch lock
at five o'clock; he knew that immediately after the
removal of these safeguards it was the custom for the
switch engine to come in on these tracks and move the
cars; he knew that if he worked after five o'clock he
would be working without any protection against this
switch engine; he knew that the work he was engaged in

doing was not noted on the card, and, therefore, even though that work may have been necessary, his foreman had not directed it to be done and did not know that he would be engaged in this work after the regular quitting time. When an employee, knowing the rules and customs with reference to safeguarding him, disregards them and puts himself in a position of danger when he knows he is not protected by the safeguards, he assumes the risk of such an injury. Seaboard Air Line v. Horton, 233 U. S. 492, 58 L. Ed. 1062; Morris v. Pryor, 272 Mo. 350; Emery v. Railroad, 246 S. W. 337; Pope v. Railroad, 254 S. W. 43; See v. Railroad, 228 S. W. 518. There was both a safe and an unsafe method of doing this work. The safe method was, therefore, notifying the foreman of his intention to repair the brake hanger. Deceased chose the unsafe method of going ahead and doing the work without notice to the foreman. In so making the choice of the unsafe method, where a safe one was available, the deceased assumed the risk, defeating recovery in this case. Hunter v. Candy Co., 271 S. W. 805; Moor v. Railway, 146 Mo. 572; Hurst v. Railway, 163 Mo. 309. (2) The instruction on the measure of damages is erroneous in that it permits the plaintiff, for the benefit of the widow and minor children of the deceased, to recover the amount of money which the jury found from the evidence the deceased would probably have contributed to each during their respective minorities. It is not a gross sum of money equal to what deceased would reasonably have contributed, but the present value thereof that plaintiff was entitled to recover. Chesapeake & Ohio Ry. v. Kelly, 241 U. S. 485, 60 L. Ed. 1117; Yarde v. Hines, 238 S. W. 151.

*Sizer & Gardner* for respondent.

(1) Plaintiff's recovery in this case is not based upon actual knowledge of the foreman that deceased was at the time of his injury, at work between the cars, but, rather, that defendant's foreman "had reasonable cause

to believe, and did believe, from all the facts and circumstances, that the deceased would continue his work until said car was completed." (a) The recovery was had rather upon the theory that said foreman had constructive knowledge of deceased's presence, working on the cars, or was in possession of such facts and circumstances as required him to use ordinary care to protect deceased from an incoming locomotive. (b) The foreman wanted the car, and was there inquiring if they would get it out. It appears in evidence that it was the practice of either the foreman or the car inspectors, or some employees other than the car repairers, to make a notation on a slip of paper of all repairs needed on a car, and leave the slip of paper at the car for the information of the car repairers. There is nothing to show what this slip of paper on this particular car contained. It appears, however, there was a slip, and that the foreman took this up about ten minutes before the accident. It is a significant fact that the slip was not introduced in evidence by the defendant. It stands undisputed that the brake hanger upon which deceased was working at the time he was killed, was defective and in need of repair. If the inspector who noted the defects in the car performed his duty as we must presume he did, he made a notation on this slip of the brake hanger at the east end of the car, as well as that of the sleeve bolt and taps and nuts in the coupler at the west end of the car. So the natural inference is that, as the foreman was attempting to check up the progress of the work with the slip in hand, he then made inquiry of the workmen whether the brake hanger had been fixed. The foreman was evidently very solicitous of having the car completed, and obtained a promise from Lake, in the presence of deceased, not that they would finish the sleeve bolt and coupler at the west end of the car, but that "we would get the car finished before we quit." (c) The foreman knew that with only ten minutes ahead of them these two workmen were then under the car at the west end, and that when the difficulty they were

then having was overcome and the coupler fixed, they would have to pass to the other end of the car and fix the brake hanger, and at his request and solicitation, he had the positive promise of these men that they would finish this car before they quit, and that they might be a few minutes after the whistle blew in doing so. The defendant offered no evidence to relieve itself of blame or explain the reasons why deceased was subjected to these unnecessary hazards. Barker, on whom the blame fell in this case, did not testify. Kame v. Railroad, 254 Mo. 175, 194; Koerner v. St. Louis Car Co., 209 Mo. 159. (2) Actual knowledge of deceased's presence by the foreman not necessary. Kame v. Railroad, 254 Mo. 175; Williams v. Railroad, 175 S. W. 900; Johnson v. Brick & Coal Co., 276 Mo. 50; Reichla v. Gruensfelder, 52 Mo. App. 60; Dawson v. Railroad, 114 Fed. 872; Wendler v. People's House Furnishing Co., 165 Mo. 527. (3) Deceased did not assume the risks of injury in this case. In fact, there is no assumption of risk in the case. Railroad v. Ward, 252 U. S. 18, 64 L. Ed. 430; Reed v. Director General, 258 U. S. 92, 66 L. Ed. 480. The negligence proximately causing Reaves's death was that of the foreman and his representative, Holcomb, in permitting the locomotive to come in upon track 8 without notice or warning to the deceased. This negligence created a sudden and unexpected danger which the deceased could not have known or appreciated, and the risk of which, of course, the deceased could not assume. While an employee assumes the ordinary risks incident to his employment, he does not assume the risks arising out of the master's negligence (which includes, of course, the negligence of any officer, agent or employee of the master) unless and until such employee knows of such dangers and appreciates the risks arising therefrom, or, unless and until such risks and dangers are so obvious that an ordinarily careful person, under the circumstances would observe and appreciate same. Railroad v. D'Atley, 221 U. S. 315, 60 L. Ed. 1016; Reed v. Director General of Railroads, supra. The Federal Employers'

Liability Act places a co-employee's negligence, when it is the ground of the action, in the same relation as that of the employer upon the matter of assumption of risks. Railroad v. Proffit, 241 U. S. 468, 60 L. Ed. 1102; Railroad v. Parucker, 244 U. S. 320, 62 L. Ed. 1166.

RAILEY, C.—This action was filed by D. E. Holman, administrator of the estate of Elmer E. Reaves, deceased, in the Circuit Court of Webster County, Missouri, against the St. Louis-San Francisco Railway Company. By stipulation the venue was changed and the cause tried in the Circuit Court of Polk County.

(1)   *The petition* alleges the appointment of plaintiff, D. E. Holman, as administrator of the estate of Elmer E. Reaves, whose death was occasioned as hereafter stated.

(2)   It is alleged that, on October 10, 1921, Virgil V. Reaves was the lawful wife of said Elmer E. Reaves; that upon the death of the latter he left surviving him his widow above mentioned, and three minor children whom he was supporting, to-wit: Chester, eight years of age; May, four years of age, and Jewel Ruby, less than two years of age.

(3)   It alleges the incorporation of defendant, and charges that it was engaged in interstate commerce, etc.

(4)   It is averred that on October 10, 1921, said Elmer E. Reaves was a car carpenter in the service of defendant at Springfield, Missouri, and as such it was his duty to assist in making repairs to defective and bad-order cars, set out on the rip-tracks for such repairs; that defendant had provided and maintained for the purpose of stationing bad-order cars a certain track, known as the new rip-track, or track number 8, in its yards at Springfield, and in the course of such work various cars were stationed, set out on said track and tagged or labeled for repairs; that while deceased and his co-workers were engaged in making repairs upon all such cars it was, at the time of his death, and for a long time prior thereto had been, the practice and custom in defendant's

yards at Springfield, to protect said rip-track by means of a certain locked switch at the end thereof, and to protect deceased and other carpenters working thereon by means of a blue flag stationed at the ends of said cars; that by reason of such long continued uses and practices of locking said switch and protecting said cars with a blue flag, the switching crews of defendant working in the yards were prohibited from coming in onto the said track with a switch engine or other cars, and were prohibited from molesting or disturbing such cars while the repairs thereon were being made; that it was the duty of defendant's foreman in charge of the work of repairing such cars to lock such switch and to put up the blue flag, and thereby protect deceased and others working under and about said cars; that it is the duty of said foreman to at all times keep said blue flag up and said switch locked, and not to remove said blue flag or to unlock said switch while deceased and others were working in and around said cars, or to otherwise permit engines or cars to come in on said track, so as to shunt, bump or otherwise move any cars upon which deceased and other employees were working, without timely notice and warning to deceased of their intentions to do so; that under the practice and custom which had prevailed for so long a period prior to the deceased's death, he and other carpenters had been educated and taught to, and did rely upon such protection as was afforded them by the use of the blue flag and locked switch aforesaid.

(5)   It alleges, that it was the duty of defendant's employees to exercise due care in the performance of the duties required of them as aforesaid, but that the employees of defendant failed and neglected their duties in such behalf, so that deceased on above date was run over and killed as hereafter set out.

(6)   It is averred, that on October 10, 1921, Elmer E. Reaves was engaged in repairing a certain brake hanger and other portions of a certain car upon the rip-track aforesaid; that at said time a number of other cars were stationed on said track so that cars were uncoupled

from each other, and stood two or two and one-half feet apart, so that workmen could pass between said cars while in the performance of their work.

(7)   It alleges, that while deceased was at work in the line of his duty, without notice or warning to him, the servants of defendant unlocked the switch connecting said rip-track with other tracks in said yards, and removed the blue flag therefrom, knowing at the time that deceased was engaged at his work in and around the cars located on said rip-track, and making repairs thereon; that shortly thereafter, while switching, defendant's employees shoved and kicked a certain string of cars onto said rip-track, which collided with other cars thereon, by means of which deceased was caught between the ends of such cars, and sustained injuries thereby which resulted in his death.

(8)   It is averred, that defendant's servants removed said flag and did said switching without warning to deceased, when they knew, or ought to have known, that deceased was at work behind said cars, and was not aware of the approach of said switching cars.

(9)   It is alleged, that the car upon which deceased was making repairs at the time he was killed was loaded with merchandise then in transit, and transported by defendant from and through points beyond the State of Missouri to its destination at a point within the State of Missouri, etc., and that deceased was then engaged in interstate commerce.

(10)   It is alleged that deceased, when killed, was thirty-two years of age, was a strong, able-bodied man and was earning large wages; that his widow, Virgil V. Reaves, at the time of his death, was twenty-nine years of age; that her husband was her sole and only support for herself and said three minor children, etc.; that by his death, they have been deprived of the monthly contributions which he set apart for the support and maintenance of said wife and children.

(11)   This parapraph of the petition reads as follows:

312 Mo. Sup.—23.

"Plaintiff states that the injuries to and the death of the said Elmer E. Reaves, and the consequent damage to his widow and children, was directly caused and occasioned, in whole or in part, through the carelessness and negligence of the defendant, its agents, servants and employees in unlocking said switch and removing the blue flag from said track without any warning or notice to the deceased of their intentions to do so, and in kicking and shunting certain cars in on the said track with great force and violence, without any warning to the deceased whatever, when they knew, or by the exercise of ordinary care on their part could have known, that the deceased and other workmen were engaged under and about said cars in the performance of their work in repairing same, and in permitting and allowing said cars to be kicked and shunted onto said track in violation of the rules of said company, and in violation of the long continued practice and custom which then existed, and when they knew that the strict observance of said custom and practice with reference to the warning and notifying of the deceased of such blue flag was his only means of protection while so working on said cars."

(12) The petition concludes, by alleging that plaintiff, as administrator aforesaid, is entitled to recover $50,000 as damages, etc.

*The amended answer* contains a general denial. It further alleges that deceased was employed as a car carpenter on the defendant's repair track, and was engaged in repairing cars; that he worked between eight o'clock in the forenoon and twelve noon, and between the hours of one o'clock and five o'clock in the afternoon of each working day, unless otherwise directed by his foreman; that the tracks on which deceased was working when injured, known as the repair tracks, are protected as alleged in plaintiff's petition, by a special lock for the purpose of locking the switches to said repair tracks, so that trains or engines cannot move in upon said tracks while men are at work about said cars; that said repair

tracks are further protected by a blue flag stationed at
or near the end of the car nearest the switch of said
track, which said flag is a signal to all employees of de-
fendant that men are working in and about the cars of
said track, and that a car or cars so protected by said
blue flag are not to be touched or moved by an engine
or cars; that it had been the rule and custom of defend-
ant for a long time to remove said blue flag, and to un-
lock said switches to said repair tracks at five o'clock in
the afternoon, the time when deceased and other car men
were ordered to leave said tracks, in order that the lo-
comotive engines of defendant might go upon said track
and remove certain cars therefrom; that said rule and
custom was well known to the deceased.

It is further alleged, that at five o'clock.p. m. on the
10th day of October, 1921, when deceased was killed, a
steam whistle of defendant was sounded, as had been
the uniform custom, which was a signal to the deceased,
and other car repairers, that it was five o'clock and that
they should quit, and leave the work upon said track;
that said whistle was a further signal and warning to
the deceased that he would thereafter not have the pro-
tection of either the blue flag or the locked switch, and
that engines would come upon said repair track and
move the cars thereon.

It is alleged, that when said whistle blew, or soon
thereafter, deceased left the place where he had been
working in repairing the coupler on a certain car and
reached a place of safety outside the rails of said track,
and thereafter walked on the outside of said track, and
along the side of the car on which he had been working,
and then walked between the rails of said repair track
at the opposite end of said car when he knew, or by the
exercise of ordinary care on his part could have known,
that said five o'clock whistle had sounded; that it was
after the time he should have quit his work and that he
would not, at that time, be protected, by either the blue
flag, or special switch lock, and that an engine was
likely to come in upon said track, and move the cars

thereon against him without warning; that while the deceased was in such position, and without notice to defendant that he was in such position, he was struck and killed when an engine came upon said track and moved the cars against him.

It is averred, that the death of said Elmer E. Reaves was due solely to his negligence in violating the well-known rule and custom of defendant as aforesaid, and to his failure to notify or warn his foreman, or the person in charge of said engine of his intention to go between said cars, and was not due to any negligence on the part of defendant.

It is further alleged, that the death of said Reaves was contributed to by his negligence and carelessness in leaving the place where he had been working repairing the car coupler aforesaid, and reached a place of safety, outside the rails of said track, after the hour for quitting work on said car had passed, and thereafter walked to the opposite end of said car and went between the rails of said track and the two cars standing thereon, for some purpose unknown to this defendant, when he knew, or in the exercise of ordinary care should have known, that an engine was near said cars, and that it was the intention of defendant to immediately move said engine on said track and against the cars, between which he was standing, and to move the same; that deceased failed and omitted to notify defendant's servants in charge of said work, or the movement of said engine, of his intention to go between said cars, or of his presence between said cars after five o'clock, at a time when defendant had reason to believe that he would be in a place of safety and away from said cars and track; that one or more of said acts or omissions acting separately, or concurrently, contributed to the injuries and death of said Elmer E. Reaves.

For further defense, it is alleged that the injuries and death of said Reaves, and the risks incident to the work in which he was engaged, if at the time he was working on one of defendant's cars, were known to and as-

sumed by him, in that he knew, at the time of going between said cars, that it was after the hour of five o'clock, when under the rule and custom of defendant he was to quit his work; and in that he was familiar with the rule and custom of the defendant to remove all signals of safety, special switch lock and blue flag at five o'clock, and prior to the time he went between said cars, and that an engine would move in upon said track and move the cars thereon immediately after five o'clock, and was familiar with the fact that if said cars were moved when he was beneath or between one or more of them he would receive injuries; that said deceased was familiar with all the risks incident to going between or beneath said cars at the time he did go between the same; that he was more familiar with above conditions then the defendant was, or could be, and that all the risks incident thereto were fully within deceased's knowledge and assumed by him.

*The reply* contains a denial of the new matter pleaded in the amended answer, and a specific denial of the allegations of same relating to the contributory negligence and assumption of risk on the part of deceased.

The evidence tends to show that appellant maintains in its yards at Springfield, Missouri, three tracks known as rip-tracks, and being numbered 7, 8 and 9. Each of these tracks is approximately a quarter of a mile in length. They run east and west, and are connected by switches with a track known as the Belt Line, at the east end. Each of the three rip-tracks are commonly known as spur tracks; that is, having no connection with any other track at their *west* end. Track No. 7 is on the south; next north of it is track No. 8, and north of the latter is track No. 9. The distance between each of these tracks is approximately nine feet. The east end of track 9 is connected by a switch with the Belt Line track, as is also track No. 8. Track No. 7 is connected by a switch with track No. 8, some fifteen or twenty feet west of the switch, connecting track No. 8 with the Belt Line, so that an engine can move direct-

ly from the Belt Line track on either track No. 8 or 9, but in order to get into 7 an engine would have to go from the Belt Line track on to track 8, and then on to track 7. These three tracks are used exclusively for repairing cars. It appears from the evidence that each track, approximately a quarter of a mile long, is generally filled with cars, which are left with a space between each car and the adjacent car, sufficient to permit workmen to perform their duties between them.

At the time of this accident about thirty car repairers were engaged in repairing cars on these three tracks. Among this number were the deceased and his partner, W. C. Lake, the principal witness in this case. All of these car repairers were working under the direction of Mr. Barker, as foreman. The hours of these car repairers were from eight A. M. until twelve noon, one P. M. until five P. M. They began work and quit work by the whistle sounded at eight o'clock in the morning, twelve noon, one o'clock and five o'clock in the afternoon. The accident occurred upon track No. 8. For the protection of these car repairers, the switches connecting tracks eight and nine with the Belt Line track—being the only place where an engine could come upon either of said tracks—were locked with a special lock, known as the repair-track lock. The switchmen had no keys to these locks. The only keys were in the possession of the rip-track foreman, Mr. Barker, and his assistants. As a precaution, there was placed between the switches and the first car on these tracks, during working hours, a blue flag, which is governed by rules known as the blue-flag rule, which provided that when any car is protected by a blue flag it indicates that workmen are at work, under or about the car, and that the latter, when thus protected, must not be coupled to, or moved, until the blue-flag signal is removed.

At eight o'clock in the morning, these switches were locked with a special rip-track lock, and the blue flag placed in the center of each track, between the switch and the first car on each track. These tracks remained

# Vol. 312 — OCTOBER TERM, 1925. — 359

locked until the whistle blew at twelve o'clock noon, at which time the car-repair men quit their work for the noon hour, and the foreman, or some one designated by him, immediately unlocked the switches to track eight and nine, and removed the blue flag. A switch engine was usually waiting for the switch to be unlocked, and the blue flag removed, in order that this engine might go in upon these tracks during the noon hour and remove cars on which repairs had been made, and place upon said tracks other cars for repairs. The engine would be off of these tracks by one P. M., and when the whistle blew the switches would again be locked, and the blue flag again replaced, and the tracks remained locked and protected by the blue flag until five P. M. When the latter hour arrived, the whistle blew, and the foreman, or some one designated by him, would again unlock the switches, and remove the blue flags, in order that the switch engine, which was usually waiting, might go upon these tracks to remove the cars on which repairs had been made, and place other cars needing repairs on said tracks.

When the five-o'clock whistle blew it found these thirty car repairers in various kinds of work, with their tools scattered about over these yards and tracks. It was the duty of the employees to gather up their tools when the five-o'clock whistle blew and place them in a store room.

In case the foreman wanted a car finished during any particular shift, or in case a car was practically finished at quitting time, it was the practice and custom of the employees to finish that car by working a few minutes overtime, and under such circumstances they would be protected by having the blue flag left in position, and the switch remaining locked, until the car was finished.

When a car was placed upon these tracks, it was inspected by the foreman, or some other employee, and all defects noted on a slip or card, which was placed at some convenient place on the car, so that the car repairers upon reaching a car, by examining this slip or tag,

could readily ascertain the needed repairs, and proceed at once with their work.

On the afternoon of October 10, 1921, deceased and a man by the name of Lake were engaged in repairing Missouri Pacific Car No. 8604, which was loaded with interstate merchandise then in transit. It appears from the evidence that deceased was engaged in interstate commerce when injured. This car on which they were working was located on track 8, about one hundred feet west of the switch, with two other cars between it and the switch. Deceased and Lake reached this car shortly after four o'clock P. M. on the above date. It is not shown in evidence just what repairs were noted on the slip or tag. About ten minutes before five o'clock P. M. on the above date, Foreman Barker, in the course of his work in the yards, reached the Missouri Pacific car supra. The deceased and Lake at that time were repairing the coupler at the west end of said car. In performing this work it became necessary to remove a certain sleeve bolt, as well as several other bolts and taps. It appears that Foreman Barker, desiring to get the car that evening, asked if they would get it done. They told Barker they were having a great deal of trouble with this sleeve bolt, and were having to cut it out with a cold chisel; and that it was hard to get the coupler head out of the way so they could get to it. Lake told Foreman Barker that they would finish the car before they quit. Lake was of the opinion, although not certain, that he also told Barker they would probably be a minute or so after the whistle blew in finishing the car. When this conversation occurred, both Reaves and Lake were sitting under the west end of said car, trying to put in the new sleeve bolt. Barker thereupon took the slip from between the springs of the car, and without the men signing it, walked away to the west. When Barker left, Lake and deceased, who operated together in their work, were still having difficulty with the sleeve bolt. They continued their work, put two sleeve bolts in the coupler, and Reaves crawled out

from under the car, over Lake's feet, while the whistle was blowing. Lake remained under the car, placed some lock nuts on these bolts, finished screwing down the nuts, and placed other nuts on top of the lock nuts. When deceased came out from under the car, he picked up a sledge hammer, walked to the east end of said car and dropped it down at the east end of same, in order to straighten a brake hanger, which was bent, on the east end of said car. A brake hanger is an inch-and-an-eighth iron rod used to support the brake beam. Deceased dropped his hammer and stepped in between the ends of said cars, and by that time Lake had arrived there, and picked up the sledge hammer to straighten the hanger, while deceased held it in position. The evidence tends to show that the work of straightening this brake hanger on the east end of the Missouri Pacific car, which deceased and Lake had been repairing, would only require two licks of the sledge hammer and about thirty seconds of time. While deceased had the brake hanger in position, and was between the couplers of the two cars, Lake struck the brake hanger one lick with the sledge hammer, and just as he drew back to strike another lick the cars suddenly came together without warning, caught and killed deceased.

The blue flag had been removed and the switch unlocked at one minute before five o'clock, and immediately after the whistle blew the switch engine came in, striking and jamming the cars together.

At the time of the accident, deceased and Lake had done nothing towards gathering up their tools, as they expected to do after the brake hanger had been straightened.

The jury returned a verdict in favor of plaintiff and assessed the damages therein as follows:

In favor of the widow, Virgil V.
   Reaves, in the sum of .............. $10,000
In favor of Chester Reaves (eight
   yrs. old) in the sum of ...........   10,000

In favor of May Reaves (4 yrs. old)
in the sum of .................... $10,000
In favor of Jewel Ruby Reaves (2 yrs.
old) in the sum of ................ 10,000

Motions for a new trial and in arrest of judgment were filed by defendant.

Thereafter plaintiff entered a voluntary *remittitur* of $25,000 and the judgment was made to read as follows:

| | |
|---|---|
| To the widow, Virgil V. Reaves ........ | $5,000 |
| To Chester Reaves ................... | 2,500 |
| To May Reaves ...................... | 3,500 |
| To Jewel Ruby Reaves .............. | 4,000 |

Making a total sum of ............... $15,000

The motions for a new trial and in arrrest of judgment were overruled and an appeal granted defendant to this court.

The instructions and rulings of the court during the progress of the trial will be considered as far as necessary in the opinion.

I. It is insisted by appellant that its demurrer to the evidence at the conclusion of the case should have been sustained. The defendant is here without any testimony, except that which was elicited from the cross-examination of plaintiff's witnesses. In order to sustain a demurrer to the evidence, we **Demurrer.** would be compelled to hold that plaintiff produced no substantial evidence tending to sustain the charge of negligence alleged in petition. In considering this subject, we must proceed upon the theory that plaintiff is entitled to every reasonable inference which a fair-minded jury of average intelligence might properly draw from the proven facts in the case.

It is undisputed that on the afternoon of October 10, 1921, a Missouri Pacific car numbered 8606, loaded, and in transit as a part of interstate commerce, was placed by defendant on switch track No. 8 for needed repairs.

It clearly appeared from the evidence that the sleeve bolt of said car at the west end of same was out of fix and needed repairing. It is equally as clear from the evidence that a brake hanger, at the east end of said car, was bent and needed straightening before said car could be safely used in interstate commerce.

In appellant's brief at page five, it is said: "The evidence discloses that the foreman indicated the character of the repairs to be made on each car by a notation of the work to be done on each car on a card, which card was fastened to some part of the car on which the work was to be done, in a place where it could easily be seen by the repair men. The repair men would then go to these cars and make such repairs as the card indicated were to be made on the particular car. When the work was completed the foreman would take up the cards."

In the absence of evidence as to what notation was made on this car, it cannot be presumed that the foreman neglected his duty in failing to inspect the east end of the car where this defective brake hanger was in plain view, nor can it be presumed, for the same reason, that the foreman was guilty of negligence in failing to make on said card a notation as to the bent and unsafe condition of the brake hanger on the east end of said car in plain view. The defective condition of the brake hanger was perfectly obvious to any one looking at the east end of said car, and its condition could have been known by Foreman Barker while in the exercise of ordinary care.

In Vandeventer v. C. & A. R. Co., 177 S. W. l. c. 838, GRAVES, J., speaking for Division One, in which all the members thereof concurred, said: "That which he" (deceased) "could have learned by the exercise of ordinary care under such circumstances will be imputed to him as a known fact."

An array of authorities was cited by Judge GRAVES, in support of the above pronouncement.

The jury were therefore justified in finding that Foreman Barker, when he placed said notation card on

the Missouri Pacific car, had notice that the bent and unsafe brake hanger in plain view on the east end of the car needed repairing, as well as the defective sleeve bolt on the west end of said car. The evidence discloses that, about ten minutes before five o'clock P. M. on October 10, 1921, the deceased and his companion workman, Lake, were under the west end of said Missouri Pacific car, repairing the defective sleeve bolt, when Foreman Barker came to the west end of the car where they were at work, and Lake testified as to what occurred as follows:

"Q. When did you see the foreman, Mr. Barker, after that? A. I seen him immediately after we went to work on the car; some ten or fifteen minutes before five o'clock, he come up and asked us if we would get the car done.

"Q. He asked you if you were going to get the car done? A. Yes, sir.

"Q. What did you tell him about getting the car out? A. I told him we would finish the car before we quit."

Lake testified that when the above conversation occurred, he and deceased were under said car putting the bolt in, and Barker was on the outside of the car picking up the slip or card. He (Barker) went west and took this card with him, which was not signed by either Lake or deceased.

As heretofore shown, the jury had the legal right to infer from the testimony, that Foreman Barker inspected the east end of the Missouri Pacific car, when he made his notations thereon, and knew of the bent and unsafe condition of the brake hanger, then open to observation. The jury were therefore justified in finding from the evidence that when the foreman left said car going west with the tag or card in his possession, he then knew both ends of said car needed the repairs aforesaid, and that the work on both ends of the car was to be finished before they quit. In the face of the foregoing, the card taken by Barker was not offered in

evidence, nor did he testify as a witness in the case to overcome the inference that the jury might lawfully draw as to his knowledge of the condition of the brake hanger on the east end of the car, while talking with Lake and deceased. It is doubtless true, that Lake did not know, before Barker left with the card, that the brake hanger on the east end of same was to be repaired, but Barker must then have known it, and the action of deceased clearly indicated that he knew the bent brake was to be repaired, for Lake testified that deceased came out from under the car on the south side, carried the sledge hammer to the east end of said car, and dropped it there in order to straighten this bent brake hanger. He was followed by Lake, who picked up the sledge hammer to straighten the brake hanger, while deceased held it in position. It appears from the evidence that two strokes of the hammer, covering thirty seconds of time, would have been sufficient to put said brake hanger in order, but after the first lick was struck with the hammer by Lake, and before another stroke could be given, deceased was caught without warning and killed while performing his duty.

In passing upon the foregoing, the jury had the legal right to take into consideration the fact that said card was not offered in evidence, and that Barker did not testify as a witness in the trial of the case, although he was charged with negligence, and as being responsible for the death of Reaves. [Reyburn v. Railroad, 187 Mo. l. c. 574-5; Murrell v. Railway Co., 213 S. W. l. c. 969; Brigham City Fruit Growers Assn. v. Produce Co., 220 S. W. l. c. 918 and cases cited.]

It is our opinion that the jury were warranted by substantial evidence in finding that Foreman Barker knew, when he left the west end of said car with the tag or card, that repairs were to be made on both ends of the Missouri Pacific car, by deceased and Lake, and that work on both ends of said car was to be finished by them before they quit. In addition to the foregoing, Lake testified that where the foreman was notified that

repairs would be finished before they quit work, "the switch was supposed to be locked and the blue flag up as long as the men were at work." Barker, as foreman, was in control of the switch tracks, of the switch locks, and of the blue flags. He likewise had superintending control over Lake and deceased. As everything relating to their safety was under the control of Barker, he had the authority to authorize these men to work a few minutes, or even hours, overtime. They told him they would finish the car, not simply the west end, before they quit. It was his duty to protect them until the car was finished, or they were notified to stop work. Lake further testified as follows:

"Q. When you notified the foreman that you were going to finish a car that he wanted out before you quit work, what had been the custom about leaving the flag up and the switch locked? A. He always left the switch locked and the flag up. . . .

"Q. State whether or not you did rely upon him to protect you by the switch lock and the blue flag. A. We always relied upon him."

Without pursuing this inquiry further, we hold that the jury were fully justified, by substantial evidence, in returning their verdict on the merits, and that the trial court committed no error in overruling appellant's demurrer to the evidence at the conclusion of the case.

II. It is claimed that the "court erred in overruling defendant's objection to the testimony of the witness, W. C. Lake, to the effect that tools were usually lying about the cars and between the rails of the track at the time the five o'clock whistle blew, and that the witness and the deceased were required, after the whistle blew, to go between the rails of the track for the purpose of gathering up these tools."

*Immaterial Evidence.*

The defendant objected to the above testimony on the theory that it was immaterial and did not tend to prove or disprove any issue in the case. Conceding the above objection to be well taken, it would afford no

Holman v. Railway Company.

grounds for reversing and remanding the cause, as appellant was not injured thereby. The plaintiff did not offer this evidence on the theory that deceased was on the track between the cars at the time and place of accident pursuant to said rule, for he was not then, as appellant states, attempting to pick up or remove the tools he had been using. We think, however, that it was proper for either party to show the general plan under which these tracks were used and the facilities furnished for guarding against danger. It appeared from the evidence, that under the general plan adopted, these switches were locked and the keys kept by the switch foreman, Barker or his assistants, and that blue flags were placed for the protection of those who were at work on these switches. The amended answer charges that at five o'clock P. M. the whistle blew—which was a signal for all these car repairers to cease work—and that immediately thereafter the switch engine was expected to go in on said tracks with cars for repair or to remove others which had already been repaired. The evidence offered tended to show that there was a limitation to said rule, which required the foreman and the switch operating crew to give the car repairers reasonable time to remove their tools from the tracks to the store room before these switch engines moved onto said tracks and jeopardized the lives of said employees. As a part of this general plan, Lake was asked without objection, if it was the custom, where a car repairer only lacked a minute or so of finishing a car, for him to continue the work until the car was finished, and he answered, that was the custom as to all car repair men. This would likewise be a limitation upon the strict five-o'clock rule above mentioned. Along the same line, in order that the court and jury should be fully informed as to the rules and customs relating to the above business, it was proper to show, as a part of said system, that these car repairers were entitled to remove their tools from the tracks, before the engines approached without warning and shoved cars

against them. We are of the opinion that appellant suffered no injury on account of the admission of said evidence, and that the trial court committed no error in overruling the above objection.

III. It is contended by appellant that error was committed, to its prejudice, in the giving of plaintiff's instruction numbered two, which reads as follows:

"2. The court instructs the jury that in determining whether or not the defendant, its agents, servants or employees were guilty of negligence as required by the preceding instruction, you should only consider the following ground of negligence relied upon by the plaintiff, to-wit: negligence in unlocking the switch and removing the blue flag and permitting the locomotive engine to run in on to the rip-track where deceased was at work, without warning or notice to the deceased.

"Therefore, if you shall believe and find from the greater weight of the testimony that a short while before five o'clock on the afternoon of the 10th day of October, 1921, the date of the death of said Reaves, the witness Lake notified the defendant's car foreman, Barker, in the presence and hearing of the deceased, that they intended to finish the car before they quit, and if you find that by reason thereof the defendant's foreman had reasonable cause to believe and did believe from all the facts and circumstances that the deceased would continue his work until said car was completed, even though it would take a short time after five o'clock in order to complete the work on said car; then it was the duty of the defendant not to unlock the switch and remove the blue flag and permit a switch engine to come in upon said track until deceased had completed his work, or until deceased had been given sufficient warning of their intention to remove the flag and unlock the switch; and if you further find that the defendant did unlock the switch and did remove the blue flag before deceased had completed his work without sufficient and reasonable notice thereof and that thereupon a switch engine did run in on said track

and did strike the cars thereon, and crush to death the said Reaves, then the defendant was guilty of negligence as required in the preceding instructions.''

We have examined the criticisms made by appellant and the authorities cited, in support of its attack on said instruction. We have fully considered the legal effect of this instruction in passing upon the demurrer to the evidence. We are of the opinion, that it properly declared the law applicable to the facts before us.

IV. It is insisted by appellant that the court erred in giving plaintiff's Instruction 6, which reads as follows:

Measure of Damages.

''6. The court instructs the jury that if you find for the plaintiff, then you should, in assessing the damages, take into consideration the age and habits of life of the deceased, as well as the age of the widow, and the ages of the minor children of the deceased; and you should allow the widow such a sum as will be a fair and reasonable compensation to her for the pecuniary loss, if any, sustained by her on account of the death of her husband; and you should also allow the minor children of deceased such sum as will be a fair and reasonable compensation to them for the pecuniary loss, if any, sustained by each of them on account of the death of their said father; and in determining the amount, if any, you allow said minor children, you should take into consideration their respective ages, as well as their condition in life, and the amount, if any, you may find from the evidence the deceased would probably have contributed to each of them during their respective minorities, had he lived, but in all your verdict should not exceed the sum of fifty thousand dollars, the amount sued for.''

In support of this contention, we are cited by appellant to Chesapeake & Ohio Ry. Co. v. Kelly, 241 U. S. 485, 60 Law Ed. 1117.

In Burtch v. Wabash Ry. Co., 236 S. W. l. c. 346, our court in banc followed the Kelly case, supra, in considering an instruction on the measure of damages. Since

312 Mo. Sup.—24.

the above decisions were rendered, the case of Louisville & Nashville Railroad Company v. Holloway, 246 U. S. 525, has been called to our attention, in which the following instruction was approved, to-wit:

"The measure of recovery, if you find for the plaintiff, being such an amount in damages as will fairly and reasonably compensate the widow of the said John G. Holloway, deceased, for the loss of pecuniary benefits she might reasonably have received if the deceased had not been killed, not exceeding the amount claimed, to-wit: $50,000."

The ruling in the Holloway case was followed in a *per curiam* opinion of the same court, in Davis v. Matthews, 263 U. S. 686.

In addition to above authorities, Division One of our court had under consideration in Pope v. Terminal Ry. Assn., 254 S. W. 43 and following, an instruction on the measure of damages, in a death case under the Federal law, which reads as follows:

"In determining the measure of damages, if any, you should take into consideration only the pecuniary loss sustained, if any, by reason of his death by his widow, Nadine Pope, . . . and by his child, Dorothy Pope, . . . not exceeding, however, the sum of $65,000, the amount prayed for by the plaintiff."

Division One approved the above instruction, and followed the ruling in the Holloway case, supra.

We are of the opinion that Instruction 6, on the measure of damages, is in harmony with the latest ruling of the Supreme Court of the United States as indicated in the Holloway case, supra. The defendant asked no instruction on this subject. In both the Burtch and Holloway cases, it is suggested that if counsel representing the defendants are fearful the jury might be misled as to plaintiff's instruction on the measure of damages, they should ask one of their own, embodying their idea of the law on that subject.

In the light of foregoing authorities, we rule that the trial court committed no error in the giving of Instruction 6, supra.

V.   It is asserted in appellant's brief that deceased assumed the risk of injury.   We are not favorably impressed with this contention, as applied to the facts in the case.   It is manifest that Foreman Barker was anxious to have this Missouri Pacific car repaired, in order that it might proceed on its interstate journey.   We have shown, that he must have known it needed repairs at both ends, when he was at the west end of the car with Lake and deceased. He did not ask them whether they would finish the west end, but used plain language, and asked if they were going to get the car done.   Lake testified that: "I told him we would finish the car before we quit."   Barker then left them with the understanding that the car was to be finished before they quit, whether it took two minutes, or longer time after five o'clock.   The latter hour was of no significance to Barker, because he was master of the situation and could ignore the five-o'clock rule in providing for the completion of this work.   If he had desired them to quit work, when five o'clock arrived, instead of continuing until the car was finished, he should have so informed them.   In other words, the deceased was performing his duty—under the direction of the master, who was in absolute control of the situation—and was stricken down without fault upon his part through the negligence of the foreman.   We are of the opinion that the doctrine of assumption of risk has no place in this case, and is without application here.   [Pope v. Terminal Ry. Assn., 254 S. W. 1. c. 46; McIntyre v. Frisco Ry. Co., 286 Mo. 1. c. 255-6.]

VI.   It is contended, that the verdict of the jury is so excessive as to indicate passion or prejudice upon their

part, which would warrant a reversal and remanding of the cause. It is true that the verdict is very **Excessive Verdict.** greatly excessive, as returned by the jury, and was so recognized by respondent, which induced him to remit $25,000 of the $40,000 verdict. We find nothing in the record which occurred during the progress of the trial that indicates the jury were prejudiced against appellant or that they acted through sympathy for the wife and minor children. It is possible that members of the jury knew that in death cases under the Federal law there is no special limitation as to the amount which may be allowed as compensation. Perhaps the jury took into consideration in estimating the damages, that the purchasing power of a dollar to-day is much less than when smaller verdicts were formerly the rule in such cases. We think the case has been exceedingly well tried by court and counsel, and that the plaintiff has presented a meritorious case on the merits. The judgment as it now stands for $15,000, apportioned between the widow and her three small children, is not excessive, and we decline to disturb the same.

VII. Some other questions of minor importance have been discussed in the briefs of counsel, and have been carefully considered by us, but we have not deemed it necessary to review the same.

We are of the opinion, that plaintiff produced substantial evidence and made a meritorious case for the jury. The judgment below is accordingly affirmed. *Higbee, C.,* concurs.

PER CURIAM:—The foregoing opinion of RAILEY, C., is adopted as the opinion of the court. All of the judges concur.